UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ANDREA HEILER,<br><br>    Plaintiff,<br><br>v.<br><br>THE HANOVER INSURANCE COMPANY,<br><br>    Defendant. | Case No. 14-11539<br>Honorable Laurie J. Michelson<br>Magistrate Judge Michael J. Hluchaniuk |

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [29]**

Defendant The Hanover Insurance Company terminated Plaintiff Andrea Heiler's employment in October 2013. Hanover says that it fired Heiler, a former senior rating specialist who worked on commercial insurance policies, for poor performance, including a possible violation of Hanover's code of conduct. While on a performance improvement plan to address her routinely poor quality scores, Heiler started to mark as complete tasks she had not been assigned and that she had not completed. Hanover thought she was padding her productivity scores so she could focus on improving her low quality scores. So Hanover confronted Heiler about this conduct. Heiler asked her manager not to involve human resources, but Hanover terminated her. Heiler argues that Hanover really discharged her because of her age (she was in her late 40s at the time), and she thus filed this action under Michigan's Elliott-Larsen Civil Rights Act.

Before the Court is Hanover's motion for summary judgment. (Dkt. 29, Def.'s Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR

7.1(f)(2). On this record, Heiler has not shown that Hanover's articulated reasons for termination were pretexts for discrimination. So the Court will grant Hanover's motion.

## I.

### A.

Defendant The Hanover Insurance Company provides property and casualty insurance. (Dkt. 29, Def.'s Mot. Summ. J. Ex. 2, Steen Decl. ¶ 3.) Plaintiff Andrea Heiler started to work for Hanover on July 8, 1996 as a customer service representative in the commercial lines department, which handles business insurance for issues such as fire, theft, general liability and workers' compensation. (Dkt. 40, Pl.'s Resp. Ex. 1, Heiler Dep. at 51, 55.) Heiler held the same position her entire time with the company, but her title ultimately changed to senior rating specialist. (*Id.* at 51, 55.)

In her position, Heiler had to input insurance policy application information into a computer system to generate policy quotes. (*Id.* at 55–66; Def.'s Mot. Ex. 9, Job Description.) After finishing a work item, Heiler was expected to mark it complete in Hanover's system and note that she had completed the work. (Def.'s Mot. Ex. 2, Steen Decl. ¶ 7.)

### B.

Heiler's work suffered from quality issues in the years leading up to her termination. For instance, her 2007 performance review noted that her quality averages in two of four quarters "need[ed] improvement." (Heiler Dep. 58–59, 61; Def.'s Mot. Ex. 10, 2007 Performance Review.) In 2008, Heiler's performance review noted that her quality averages in three of four quarters "need[ed] improvement" because she was below the 80% average she was expected to maintain. (Heiler Dep. at 62; Def.'s Ex. 11, 2008 Performance Review.) In 2009, Heiler decreased her productivity during one quarter to focus more on quality. (Heiler Dep. at 67–68.)

Yet her quality that year fared even worse than before: she fell well short of the 80% quality target every quarter. (Def.'s Ex. 13, 2009 Performance Review.) Thus, in late 2009, Heiler's manager at the time, Rusteena Mills, placed her on a performance improvement plan. (Heiler Dep. at 64–65; Def.'s Ex. 12, 2009 Performance Improvement Plan.)

In 2010, Heiler began reporting to Sherrie Steen. (Heiler Dep. at 68.) In Heiler's 2010 performance review, Steen gave Heiler an overall rating of "successfully achieved performance standards" but noted, "There have been a couple of careless high profile errors that occurred this year. Andi was receptive to the feedback and I feel confident she is slowing down and paying more attention to detail." (Heiler Dep. at 68–69; Def.'s Ex. 2-A, 2010 Performance Review; Steen Decl. ¶ 8.) But Heiler's quality averages were low again in 2011. (Steen Decl. ¶ 9.)

In 2012, though the quality goal climbed to 90% for Heiler's department, Heiler's quarterly averages were 55%, 57%, 33% and 53%. (Heiler Dep. at 70; Def.'s Ex. 14, 2012 Performance Improvement Plan.) In her 2012 performance review, Heiler's overall rating was "met some performance standards," but the review noted that her annual quality result was 48% and that she "has not taken accountability for her poor quality results." (Heiler Dep. at 80–81; Def.'s Ex. 15, 2012 Performance Review.)

Steen met with Heiler several times in 2012 to discuss performance, and Steen twice recommended for Heiler to meet with a learning consultant to improve her quality scores. (Heiler Dep. at 71.) Steen says that Heiler failed to follow up on those requests. (Def.'s Mot. Ex. 3, Steen Dep. at 13.) Heiler, however, says that she had problems scheduling the meetings and that she backed out of a scheduled meeting because she "didn't have anything to review with [the learning consultant] that day." (Heiler Dep. at 77–79.)

Steen placed Heiler on her second performance improvement plan in December 2012. (Def.'s Ex. 14, 2012 Performance Improvement Plan.) Among other things, the plan specified, "Beginning in January 2013, you must obtain a minimum of 70% quality and increase these results by 10% each following month until 90% is obtained and sustained." (*Id.*) Steen also required Heiler to set up weekly meetings with the learning consultant starting the week of December 17, 2012. (*Id.*)

In a January 8, 2013 meeting, Steen told Heiler that her December 2012 quality score of 33% did not show any improvement. (Heiler Dep. at 74; Ex. 2-C, Email from Sherrie Steen.) On February 15, 2013, Steen met with Heiler and noted that her quality score had improved from December to 60%, but that was still below her goal. (Def.'s Ex. 2–D, Email from Sherrie Steen; Heiler Dep. at 75.) Steen also noted that Heiler's meetings with the learning consultant "had not been consistent" and her "performance and commitment to quality & behavioral improvement has not be [sic] evident" after going on the performance improvement plan. (Def.'s Ex. 2–D, Email from Sherrie Steen; Heiler Dep. at 76.)

Hanover planned to fire Heiler if her performance did not improve in February 2013. (Def.'s Mot. Ex. 5, Haggard Decl. ¶ 6; Def.'s Mot. Ex. 5-A, Email from Debra-Jo Stenman.) But Heiler's quality average did improve in February, so Hanover did not terminate her at that time. (Haggard Decl. ¶ 6.) Due to improving quality scores, Hanover removed Heiler from formal performance monitoring by June 2013, but Steen told Heiler that she had to sustain her performance. (Heiler Dep. at 82; Steen Dep. 17-18.) Heiler's 2013 mid-year performance review—required because of her less than favorable 2012 year-end review—gave her an overall rating of "successfully achieving performance standards." (Steen Dep. at 19; Heiler Dep. at 83–84; Def.'s Ex. 17, Stenman Dep. at 12.)

4

## C.

The parties dispute why Heiler's quality improved. Steen says that Heiler artificially inflated her productivity score to give her more time to focus on her quality score. (Steen Dep. at 30.) In particular, while reviewing her team's productivity reports in October 2013, Steen discovered that in February and August 2013, Heiler had cleared or marked completed around 130 work items in Hanover's system that belonged to a different department, were not within the geographic territory to which Heiler was assigned, and that had not been assigned to her. (Steen Decl. ¶¶ 19–28; Steen Dep. at 21–24, 28–29, 39; Def.'s Mot. Ex. 7, Baldus Decl. ¶ 5; Def.'s Mot. Ex. 8, Baldus Dep. 16-17, 22.) Though the average number of weekly completed work items for Steen's group ranged from 28 to 33, Heiler's spiked to 103 for the week of February 17th, 95 for the week of August 11th, and 56 for the week of August 25th. (Steen Decl. ¶¶ 19–20; Def.'s Mot. Ex. 2-E Weekly Transaction Reports.) These suspiciously completed items included customer requests for address changes, adjustments to policies, changes in coverage, policy cancellations, and policy renewals. (Heiler Dep. at 92.) And the items were from a department that handles "professional lines," which is separate from Heiler's department. (Steen Decl. ¶¶ 25–26.)

Heiler admits much of this. She admits that she did in fact clear these professional lines work items. (Heiler Dep. at 84.) She admits that the work was not assigned to her (and that she was not responsible for assigning work to herself). (Heiler Dep. at 56–57; 85–86.) She also admits that she did not complete the work associated with those items or check with anyone to ensure the work had been done. (Heiler Dep. at 84–85.) She further admits that she could not have completed the work—she could not access the systems necessary to work on the relevant insurance policies. (Heiler Dep. at 57–58; 84–85.) Importantly, Heiler also admits that if the

work had not actually been completed for the cleared items, it would have resulted in unhappy customers and potential liability issues for Hanover. (Heiler Dep. at 92.) And finally, she admits that completing these items made her productivity numbers look higher, which would have given her more time to focus on her quality. (Heiler Dep. at 90–91.)

Nevertheless, Heiler maintains that her intent was not to inflate her productivity numbers to focus on her quality. (Heiler Dep. at 91.) Instead, Heiler says that she thought that she was doing her company a favor by clearing out old files that could have affected its performance goals. (Heiler Dep. at 85–86, 89.) Though Steen says that Heiler "did not have access to the systems necessary to complete [the] work or confirm that it could appropriately be cleared," (Steen Decl. ¶ 30), Heiler says that she checked Hanover's billing system to see if the items were done and that she cleared them only after determining that "they looked like they were done." (Heiler Dep. at 85–87.) Heiler cites her results in April 2013 as evidence of her benevolent intent: that month her productivity was not higher from clearing any unassigned work items, but her quality was high at 94%. (*See* Steen Dep. at 15–16.)

Still, when Steen confronted Heiler, Steen says that Heiler provided no credible explanation for her conduct. (Steen Decl. ¶ 31.) Instead, Heiler admittedly asked Steen to avoid involving human resources if she promised to stop. (*Id.*; Heiler Dep. at 87.) Steen therefore concluded that Heiler "falsified information and . . . marked work items complete but did not actually do the work." (Steen Dep. at 37.) At one point in her testimony, Heiler said that she explained to Steen her innocuous reason for clearing the items (Heiler Dep. at 85), but at another point, Heiler testified that Steen "would not let me explain any of this" (*Id.* at 87).

6

**D.**

On October 22, 2013, Hanover decided to terminate Heiler, and it claims to have done so because of Heiler's performance issues and "her violation of Hanover's Code of Conduct and core values, and concerns regarding her lack of integrity." (Steen Decl. ¶ 32.) As for the suspected code of conduct violation, Hanover's employee code of conduct "does not tolerate fraudulent behavior." (Def.'s Mot. Ex. 5-C, at 9.) Heiler admitted that she was aware of that code of conduct and understood that dishonest conduct, including falsifying or mispresenting records, was a terminable offense. (Heiler Dep. at 53.)

Four people made the decision to terminate Heiler: her manager, Steen (age 42 at the time), two Hanover human resources personnel, Stephanie Haggard (age 38) and Debra-Jo Stenman (age 62 at the time), and Valerie Baldus (age 51 at the time), Hanover's Director of Commercial Lines Operations at the time. (Steen Decl. ¶¶ 32–33; Def.'s Mot. Ex. 5, Haggard Decl. ¶¶ 1, 8; Def.'s Mot. Ex. 6, Haggard Dep. at 37-38; Def.'s Mot. Ex. 7, Baldus Decl. ¶¶ 7–8; Def.'s Mot. Ex. 8, Baldus Dep. 25; Def.'s Mot. Ex. 16, Stenman Decl. ¶¶ 4, 6; Def.'s Mot. Ex. 17, Stenman Dep. 16-17.) They all say that they did not know Heiler's age at the time. (Steen Decl. ¶ 44; Haggard Decl. ¶ 10; Baldus Decl. ¶ 9; Stenman Decl. ¶ 5.)

Heiler testified that she did not know who was involved in the decision to terminate her. (Heiler Dep. at 105–06.) She also acknowledged that she cannot point to any facts showing that Steen, Baldus, Stenman or Haggard discriminated against her because of her age. (*Id.* at 113.) Finally, Heiler acknowledged that she cannot point to any individual who engaged in similar conduct but was not terminated. (*Id.* at 108.)

7

**E.**

On February 27, 2014, Heiler filed suit against Hanover in Livingston County Circuit Court, and the case was removed to this Court on April 14, 2014. (Dkt. 1, Notice of Removal.) She filed an amended complaint on April 17, 2014. (Dkt. 4, Am. Compl.) Her sole count alleges that Hanover's termination of her constituted age discrimination in violation of Michigan's Elliott Larsen Civil Rights Act. (Am. Compl. ¶ 15.) Hanover filed its motion for summary judgment on April 30, 2015. (Dkt. 29.) The motion is fully briefed. (*See* Dkts. 40, 43.)

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Heiler. *See Matsushita*, 475 U.S. at 587.

### III.

Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . ." Mich. Comp. Laws § 37.2202(1)(a).

"ELCRA age-discrimination claims are analyzed under the same framework as discrimination claims brought under the federal Age Discrimination in Employment Act (the 'ADEA'), 29 U.S.C. § 621 *et seq.*" *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 307 (6th Cir. 2015) (citation omitted). When, as here, a plaintiff "seeks to establish a violation of the ELCRA through use of circumstantial evidence," the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Tilley*, 777 F.3d at 307–08. Under this framework, Heiler must first establish a prima facie case of discrimination. *See id.* If she succeeds, the burden then shifts to Hanover "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *See id.* (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)). Heiler would then have the burden to "show that [Hanover's] explanation was a mere pretext for intentional age discrimination." *See id.*

The parties dispute the nature of Heiler's ultimate burden. Hanover urges that Heiler must show that age discrimination was the "but for" cause for her termination. (Def.'s Repl. at 1–2.) But as the Sixth Circuit has made clear, "In contrast to the [federal Age Discrimination in Employment Act's] 'but-for' causation burden, under the ELCRA a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the

9

decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192–93 (Mich. 2003)).

**A.**

Under the first step of the *McDonnel Douglas*' burden-shifting framework, Heiler must establish a prima facie case of discrimination by showing "1) that [s]he was a member of a protected class; 2) that [s]he was discharged; 3) that [s]he was qualified for the position held; and 4) that [s]he was replaced by someone outside of the protected class." *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015) (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)).

The parties do not dispute that Heiler meets the first two elements—Hanover discharged Heiler, and she was in her late 40s at the time. Hanover challenges Heiler's ability to meet only the last two elements: her qualification and whether a younger person replaced her.

**1.**

Under ELCRA, Heiler was qualified for her position if she "was performing [her] job at a level that met [Hanover's] legitimate expectations." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997)).

Hanover's argument boils down to this: Heiler cannot establish she was qualified for her position because she "admits that she had a six-year history of failing to meet Hanover's objective quality expectations, . . . admits she had been placed on two [performance improvement plans] by two different managers and . . . admits that she engaged in conduct which violated Hanover's Code of Conduct and core values." (Dkt. 43, Def.'s Repl. at 2–3.)

The problem for Hanover is that this is the same evidence it relies on to justify its termination of Heiler. (*See* Def.'s Mot. at 14 (asserting that Hanover terminated Heiler "due to

10

performance reasons, including her violation of Hanover's Code of Conduct and core values, and concerns regarding her lack of integrity").) And the Sixth Circuit has held that it is inappropriate for a court to consider at this stage this type of evidence: "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). In other words, a court "should only consider the employer's proffered reason in the later stages of the *McDonnell Douglas* analysis." *Cicero*, 280 F.3d at 585 (applying *Cline* in ELCRA age discrimination case); *see also Mccarthy v. USA Credit Union*, No. 289014, 2010 WL 2629788, at *6 (Mich. Ct. App. July 1, 2010) (applying *Cicero* in ELCRA age discrimination case).

Putting aside Hanover's proffered reasons for terminating Heiler, a reasonable jury could conclude that Heiler was qualified for her position. For one, Heiler worked in the same position at Hanover from 1996 until her termination in 2013. (Heiler Dep. at 51, 55.) Her close to 20 years at the company strongly supports an inference that she met Hanover's "minimum qualifications" at the time of her termination. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (holding for purposes of ELCRA and federal age discrimination claims that the plaintiff's 25 years in her position prior to termination was "compelling evidence that [she] met the [employer's] objective minimum qualifications at the time of her termination, notwithstanding her previous negative performance reviews").

And even the performance evidence Hanover cites does not foreclose an issue of fact as to whether Heiler met her employer's objective minimum qualifications. Heiler's performance reviews in the few years leading up to her termination are certainly not strong endorsements of

11

her qualification: she routinely struggled with quality issues, and her overall rating for the years available was often only "Met Some Performance Standards." (*See* 2008, 2009 and 2012 Performance Reviews.) But sometimes she was rated at "Successfully Achieved Performance Standards." (*See* 2007, 2010 Performance Reviews). And no review in the record rated her at the lowest level of "Did Not Meet Performance Standards" or otherwise indicated that she lacked the qualifications for her position.

Furthermore, as late as April 2013, several months before her termination, Heiler achieved a 94% monthly quality average, which her supervisor (Steen) characterized as "Great results!" (Pl.'s Resp. Ex. 3, Meeting Invitation from Steen; Steen Dep. at 15–16.) Heiler's performance improvement plan thus ended the next month, and her performance was no longer formally monitored. (Haggard Dep. at 19–20, 23.) No evidence specifically proves that these April 2013 results were inflated by Heiler's practice of clearing completed work items from outside her department, which would have given her more time to focus on quality, as that conduct was apparently confined to February and August 2013. (*See* Steen Decl. ¶¶ 19–28.)

Accordingly, Heiler has raised a genuine issue of material fact as to her qualification at the time of her termination.

### 2.

As for the final element of a prima facie case of age discrimination in an ELCRA claim, Heiler must show that she was replaced by a younger person or that Hanover "treated [her] differently than persons of a different age class who engaged in the same or similar conduct.'" *See Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011).

Heiler first argues that she meets this element because "younger counterparts were not disciplined/treated the same as Plaintiff despite having similar performance issues." (Pl.'s Resp. at 18.) Heiler points to Christopher Arth, a newer and younger employee who had an overall 2014 performance rating of "successfully achieved performance standards" even though his productivity average was lower than the goal. (Pl.'s Resp. at 18; Pl.'s Ex 12, Arth 2014 Performance Review.) But Arth's performance issue was not similar to Heiler's. Productivity was not Heiler's issue; her problem was quality. (Heiler Dep. at 90–91.) Heiler also points to Elizabeth Theisen, a younger employee who had productivity *and* quality averages below the company's goals in her 2013 mid-year and year-end reviews yet received a performance rating of "successfully achieved performance standards." (Pl.'s Resp. at 19; Pl.'s Resp. Ex. 13, Theisen 2013 Performance Reviews.) But whereas Heiler's performance issues were a recurring problem, Theisen's mid-year review suggests that her quality issue in 2013 was atypical for her: "Liz's quality results from January-May average 85%. Her June results are currently 50% but two items are being appealed and will more than likely be overturned. This will increase her June quality result to 70%. Historically she has achieved stronger quality results than this so I am hopeful June was isolated and that we will see improvement going forward." (*Id*.) Similarly, while Theisen's year-end review shows relatively low quarterly quality results of 57% (Q1), 90% (Q2), 77% (Q3), and 83% (Q4), the review noted that the results were skewed because she took on new responsibilities: "[d]uring the first quarter, Liz was still learning package processing so her results reflected this" and "[i]n September, she learned umbrella so her most recent results reflect two lines of business and I feel she ended the year well." (*Id.*)

More important, the evidence concerning Arth and Theisen misses the mark because Heiler was not simply terminated for poor performance. She was terminated because Hanover

13

suspected her of violating its code of conduct—in the midst of a performance improvement plan for poor quality, she admittedly engaged in a practice that could have improperly padded her productivity numbers to give her more time to focus on her quality. She has not shown that any younger employee—Arth, Theisen, or otherwise—engaged in similar suspected misconduct but was treated more favorably. In fact, the only evidence surrounding how Hanover responded to another employee's possible code of conduct violation indicates that Hanover terminated a younger employee (age 36) for "misclassifying and misreporting cross sells" in 2011. (*See* Haggard Decl. ¶ 18.) Thus, Heiler has not raised a genuine issue of material fact as to whether Hanover treated similarly situated younger employees more favorably than her.

But Heiler also argues that she satisfies the final element of her prima facie case of age discrimination because she was replaced by a younger person. (Pl.'s Resp. at 18.) For purposes of ELCRA, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform plaintiff's duties." *Lytle v. Malady*, 579 N.W.2d 906, 917 n.27 (Mich. 1998) (quoting *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Hanover says that other members of Steen's group absorbed Heiler's responsibilities. (Def.'s Mot. at 19.) In response, Heiler emphasizes, "**This is an outright lie**." (Pl.'s Resp. at 18 (emphasis in original).)

Heiler's problem is that she has failed to point to any specific facts showing that a younger person replaced her. As Debra-Jo Stenman (from Hanover's human resources) testified, "[Heiler] was not replaced right away with a senior rater. . . . When [Heiler] left, her responsibilities were dispersed amongst the team." (Stenman Dep. at 19.) Heiler claims that

14

"Stenman testified that Plaintiff was replaced a few months after she was terminated." (Pl.'s Resp. at 18.) But all Stenman said was that in February 2014, several months after Heiler's termination, "we brought on a few people" as ratings specialists, two of whom came from inside the company. (Stenman Dep. at 19–20.) Granted, two of those individuals were younger than Heiler. (*See* Heiler Dep. at 5; Pl.'s Resp. Ex. 5, Def.'s Supp. Addendum to Interrogatory Response No. 5; Pl.'s Resp. Ex. 8, Def.'s Resp. to Doc. Request No. 11.) But Heiler has not pointed to any evidence suggesting which one of these new hires, if any, actually was assigned to perform her duties and thus replaced her. Accordingly, the Court finds it doubtful that Heiler has raised any *genuine* issue of material fact as to whether a younger person replaced her.

Nonetheless, the Court need not fully resolve this issue—even assuming that Heiler could establish her prima facie case, Hanover has offered a legitimate reason for terminating her, and Heiler has not rebutted that with evidence sufficient for a reasonable jury to find that the reason was a pretext for unlawful age discrimination. *See McCowen v. Vill. of Lincoln Heights*, No. 15-3040, — F. App'x —, 2015 WL 4978979, at *3 (6th Cir. Aug. 21, 2015) ("even assuming that [plaintiffs] have established a prima facie case, [the employers] have articulated a legitimate, nondiscriminatory reason for the discharge—and the [plaintiffs] have not rebutted that reason by showing pretext").

### B.

Hanover says that it terminated Heiler "due to performance reasons, including her violation of Hanover's Code of Conduct and core values, and concerns regarding her lack of integrity." (Def.'s Mot. at 14.) Heiler claims that these reasons were pretexts for age discrimination. (Pl.'s Resp. at 20–23.) A reasonable jury could not find, more likely than not, that Hanover's stated reason for termination is pretextual.

15

In an ELCRA age discrimination claim, a plaintiff can establish pretext in one of three ways: "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 760 (Mich. Ct. App. 1990).

Heiler says that all three options apply here. (Pl.'s Resp. at 20.) First, Heiler says that the performance reason for terminating her was "completely fabricated" because "**[s]he received praise in 2013 for her performance.**" (*Id*. at 20, 22 (emphasis in original).) Yet again Heiler's emphasis does not rescue her argument. Heiler's poor performance track record is not reasonably subject to dispute in this case. Years of negative performance reviews reflected that she routinely fell well short of meeting Hanover's quality requirements. She was thus twice placed on performance improvement plans—once in 2009 and again in 2012—and required to meet with a learning consultant. Though she was praised for "[g]reat results" in a single month in 2013, that praise came before Steen uncovered Heiler's practice of marking items from another department as completed in Hanover's system. (*See* Steen Dep. at 15–16; Steen Decl. ¶¶ 19–31.) Heiler says that her intent was benign. (Heiler Dep. 85–86, 89.) But even she admits that this practice would have skewed her productivity results and given her more time to focus on her quality. (Heiler Dep. at 90–91.) Thus, no reasonable jury could find that Hanover had no basis in fact to terminate Heiler for performance reasons.

Next, Heiler appears to argue that her performance issues did not actually motivate Hanover's decision to terminate her because she says it was nothing more than a "shifting justification." (Pl.'s Resp. at 22.) In her brief, she says that she "was advised that she was being terminated for an alleged Code of Conduct violation" and "[p]erformance was not discussed."

16

(*Id.*) This statement is not a full representation of the record. It is true that when asked whether anyone explained the reason for her termination, Heiler simply answered, "They said because I was in violation of [] their Code of Conduct." (Heiler Dep. at 96.) But in a November 2013 email, shortly after her termination, Stephanie Haggard from Hanover's human resources team clearly indicated that Heiler was "let go . . . due to performance reasons, including your violation of our Code of Conduct and core values"—the very same reasons maintained years later in this litigation. (Def.'s Mot. Ex. 5-C, Email from Stephanie Haggard.)

Heiler also says that the fact that she was caught marking another department's items as completed in Hanover's system is insufficient to justify the decision to terminate her because she confirmed the items had been completed before clearing them. (Pl.'s Resp. at 20–21.) She also says that the code of conduct violation was "fabricated" because no one "undertook to determine whether any specific task was cleared or marked as completed where, in fact, it was not completed." (*Id.* at 23.) Thus, Heiler maintains that she never violated Hanover's code of conduct and that by engaging in the conduct Hanover viewed as suspicious, she "thought she was doing a good thing." (*Id.* at 20–21.)

But her employer had good reason to believe otherwise, and the Court is hard pressed to second-guess Hanover's business judgment. The Sixth Circuit has held in the context of federal age discrimination claims that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Similarly, in the ELCRA context, a "business judgment rule" applies: "The soundness of an employer's business judgment . . . may not be questioned as a means of showing pretext." *Brocklehurst v. PPG*

17

*Indus., Inc.*, 123 F.3d 890, 898 (6th Cir. 1997) (quoting *Dubey v. Stroh Brewery Co.,* 462 N.W.2d 758, 760 (Mich. Ct. App. 1990)). At least one Michigan Court has held that the business judgment rule under ELCRA is "no more than a different iteration" of the Sixth Circuit's honest belief rule. *See Movsisyan v. IPAX Cleanogel, Inc.*, No. 299235, 2013 WL 2494979, at *6 (Mich. Ct. App. June 11, 2013) *appeal denied*, 495 Mich. 991, 845 N.W.2d 107 (2014).

Accordingly, assuming the truth of Heiler's claim that her reasons were benign and she actually checked to ensure that anything she marked as complete actually was completed, she still has not raised a genuine issue of material fact concerning whether Hanover's decision to terminate her for this practice was a pretext for age discrimination. Heiler acknowledges that the work in question—the dozens of work items assigned to the professional lines group at Hanover—was not assigned to her and that she was not supposed to be working on it. (Heiler Dep. at 85–86.) She did not consult with anyone to see if she should have cleared the items. (*Id.* at 85.) Nor did she consult with anyone to see if the underlying work had actually been completed. (*Id.* at 85–86.) While she maintains that the she checked to ensure that the work was complete, (*Id.* at 85), Hanover disputes that she even had the capability to so, (Steen Decl. ¶ 30). And if for some reason the underlying work had not actually been completed, Heiler admits there would have been clear risks to her employer: Hanover would face customer relations issues and possible liability. (Heiler Dep. at 92.) Moreover, Heiler engaged in this conduct in the midst of her performance issues that resulted in her placement into a performance improvement plan, making it reasonable for Hanover to believe she had a motive to pad her numbers. And once confronted by Steen about this conduct, she asked to avoid bringing human resources into the mix and promised not to do it again. (*Id.*; Heiler Dep. at 87.) All of this evidence prevents the Court from second guessing Hanover's business judgment when it decided to terminate Heiler

for tinkering with Hanover's system in a way that was clearly outside of the scope of her responsibilities.

The only evidence left in Heiler's favor is what she pointed to in her attempt to establish a prima face case of discrimination: Heiler's claims that two younger employees were not disciplined despite certain performance issues and that a younger person replaced her. "Evidence produced in support of a plaintiff's prima facie case 'may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext.'" *Garrett v. Sw. Med. Clinic*, No. 15-1020, — F. App'x —, 2015 WL 7567626, at *4 (6th Cir. Nov. 25, 2015) (quoting *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 533 (6th Cir. 2007)). Here, this evidence is insufficient to show a genuine issue of material fact concerning pretext. As discussed above, neither of the younger employees Heiler cites—Arth and Theisen—had the same performance issues as Heiler or were suspected of violating the company's code of conduct. And Heiler has pointed to no evidence showing who actually replaced her. The only specific testimony concerning replacement was that Heiler was *not* replaced—at least right away—and that her duties were absorbed by existing employees. (Stenman Dep. at 19.) While two of the three people hired into Heiler's group several months after her termination were younger than her, the mere possibility that one of the younger ones replaced Heiler, without more, does not establish that Hanover's reasons to terminate Heiler—performance issues and a suspected code of conduct violation— were pretexts.

In sum, Heiler has not put forth enough evidence for a reasonable jury to conclude that Hanover's proffered reasons for terminating her were pretexts for age discrimination.

## IV.

For the reasons stated, no reasonable jury could find that age discrimination was a substantial or motivating factor in Hanover's decision to terminate Heiler. Accordingly, Defendant's Motion for Summary Judgment (Dkt. 29) is GRANTED, and this case is DISMISSED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: January 7, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 7, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson